GRANT v. NEW YORK HERALD CO.

(Supreme Court, Appellate Division, First Department. June 3, 1910.)

1. JURY (§ 45*)—QUALIFICATION OF JURORS—STATUTES.

Under Judiciary Law (Consol. Laws, c. 30) § 598, providing that a juror must be of good character, one recently convicted of an assault on a female under age is disqualified to serve as a juror.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 249, 251; Dec. Dig. § 45.*]

2. JURY (§ 149*)—DISQUALIFICATION—MOTION TO WITHDRAW JUROR.

A motion to withdraw a juror on the ground that he was disqualified because recently convicted of an assault on a female under age, made during the trial in an action for libel based on a newspaper publication charging that the plaintiff was associating with lewd women, should be granted.

[Ed. Note.—For other cases, see Jury, Dec. Dig. § 149.*]

3. LIBEL AND SLANDER (§ 86*)—LIBELOUS WORDS—MEANING OF WORDS.

Where a word, alleged to be libelous, has two meanings, one bad and one good, the latter will be taken, unless by way of innuendo the bad is brought to the attention of the court and relied on.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 205–208; Dec. Dig. § 86.*]

4. LIBEL AND SLANDER (§ 86*)—LIBELOUS WORDS—MEANING OF WORDS.

Where particular English words have acquired some sense different from their natural one, an averment, in an action for libel by way of inducement, of that acquired sense is necessary, and an innuendo without such an averment is insufficient.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 205–208; Dec. Dig. § 86.*]

5. LIBEL AND SLANDER (§ 100*)—LIBELOUS WORDS—MEANING OF WORDS.

Where the complaint in libel for a newspaper publication, stating that plaintiff had been arrested for reckless automobiling with a female companion designated as his "affinity," set forth the article, and alleged that it meant to charge that plaintiff was guilty of adultery, but did not allege that the word "affinity" had acquired a new and odious meaning and

---

was published with such meaning, evidence of prior use by defendant in its newspaper of the word in an odious sense was inadmissible.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 246–272; Dec. Dig. § 100.*]

Appeal from Trial Term, New York County.

Action by Peter Geddes Grant against the New York Herald Company. From a judgment for plaintiff entered on a verdict, and from an order denying a motion for a nonsuit and denying a motion for withdrawal of a juror, and denying a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Jay & Candler (Robert W. Candler, of counsel), for appellant.

Ely & Fuller (Charles Fuller, of counsel, and Moses Ely, on the brief), for respondent.

CLARKE, J. The alleged libel was published in the New York Herald September 21, 1907, and is as follows:

"His Affinity Rides. Wife Finds Bail. Peter Geddes Grant, Accompanied by Girl Companion, Leads Wild Automobile Chase. Arrested. Telephones Home. Theater District in Turmoil as Big Touring Car Tears Through the Streets, Defying Capture.

"Peter Geddes Grant, a broker of No. 462 West 22d street, had an 'affinity' in the big touring car with which he led the police of three precincts a two-hour chase through the theater district last night, but when he was caught he had to send for his wife to bail him out.

"With the young woman who was of striking appearance, and who laughed at the discomfiture of those who narrowly escaped being run down by the big machine, Grant drove recklessly up and down Broadway, Seventh, and Eighth avenues, and the streets from Twenty-Third to Fifty-Seventh streets. He was finally forced to check his career through lack of gasoline and was arrested.
\*   \*   \*

"Stopping at the Rutland Apartment House, at Fifty-Seventh street and Broadway, Grant left the machine with his companion. A message was sent up to him that the automobile had been stolen, and when he appeared he was arrested and taken to the West Forty-Seventh Street station."

The complaint alleges:

"That by said article defendant meant and intended to mean that plaintiff was guilty of the crime of adultery, was associating and consorting with a mistress, or a woman of lewd and unchaste character, had gone with said mistress or lewd and unchaste woman to an apartment, and there remained with her."

Plaintiff had a verdict for $15,000, and the evidence justified the jury in finding that the article was false and libelous. There are but two matters which we consider necessary to discuss upon this appeal.

On the second day of the trial, counsel for the defendant learned that the foreman of the jury had been recently convicted in Special Sessions of the crime of indecent assault upon a young woman under age. He thereupon made an investigation, produced a certified copy of the court record showing the conviction, and obtained an identification by the person who had obtained the conviction, and in the presence of plaintiff's counsel, during a recess of the court, laid these mat-

ters before the justice presiding at the trial and moved to withdraw a juror upon the ground that the conviction of the foreman on said charge disqualified him to sit as a trial juror in this case. The trial justice stated that he would go on with the trial and reserve his decision on such motion until after the jury had rendered its verdict. These matters were made a part of the case upon appeal by an affidavit and by a stipulation that the foregoing statement of facts was true, and the court in its order denying a motion for a new trial formally denied the motion for the withdrawal of a juror.

The question is not here presented of a motion to set aside a verdict and vacate a judgment for the disqualification of a juror discovered after the rendition of the verdict and the entry of judgment. The motion was made during the progress of the trial to withdraw the juror upon the ground of a palpable disqualification to sit as a juror in an action of this character. Judiciary Law (Consol. Laws, c. 30) § 598, expressly provides, among the qualifications of a trial juror in the county of New York, that he must be of good character. It needs no argument to support the proposition that a person convicted of a crime of such turpitude as that whereof this juror stood convicted did not possess the good character required by the provisions cited. The motion to withdraw the juror was addressed to the sound discretion of the court. Under the circumstances disclosed, the motion should have been granted.

2. There were offered by the plaintiff, and received in evidence, three articles published in the New York Herald on September 5, 6, and 18, 1907, respectively, prior to the publication of the libel complained of. These articles in no way referred to the plaintiff nor to the incident involved in the publication complained of. The first of these articles is headed:

"Ferdinand Pinney Earle, Mobbed by Enraged Neighbors, His Carriage Upset, He Is Forced to Fight for Life. His Wife Driven to Europe by Him, He Returns to Monroe to Find the Town in Arms. Hang Him! the Cry from 500 Voices. Hurled from His Vehicle to Muddy Street He Defies Assailants with Whip. Knocks Down Firemen. Finally Rescued by Police. He Flees to His Home, Still Daring his Neighbors to Do Their Worst."

It is a long article purporting to be an account of the way Earle's townspeople greeted him upon his return to Monroe after he and his wife had arranged that the latter should sail for France to seek a divorce so that Earle might marry a woman termed in several places his "affinity" after such divorce had been obtained. The second article is headed:

"Tar and Feathers in Hands of Mob Wait for Earle. Angry Crowd Lingers in Station at Monroe for Return of the Artist. Rope and Eggs also Ready for Townsman. Remaining in New York, He Declares Discarding of Wife is an 'Educational' Act. May Take Affinity to China. If Mrs. Earle Fails to Obtain a Divorce in Europe Her Husband May Go to Orient"

—and purports to be an account of the way in which some of Earle's neighbors prepared to treat him upon his arrival at Monroe, and a further account of his family affairs, and the woman for whom it is said he had discarded his wife is alluded to in several places in this article as his "affinity." The third article is headed, "These Twin Souls May

Go To Jail," and states that a man and woman had been arrested under the law making it a misdemeanor for a married man or woman to live illegally with another, states that the man and his "affinity" are arrested, that the wife caused the arrest and revealed another "affinity" story.

The offers and rulings upon these papers were as follows:

"I offer it for the purpose of showing the meaning attached to the word 'affinity' by the New York Herald in the article published in the Herald on September 5th. (The two subsequent articles were then offered.) The Court: I take it they are offered for the purpose of showing the meaning attached to the word 'affinity' by the New York Herald? Plaintiff's Counsel: Yes, upon the question of malice. The Court: If it were a mere matter of showing the meaning of a term, I should hold it incompetent; that it would be immaterial what meaning the New York Herald attached to it. That would not establish its generally accepted meaning; but upon the question of malice is it not material and competent to show that, when they used this term, they had in mind a certain meaning? * * * It is offered solely for the purpose of proving express malice? Plaintiff's Counsel: That is all, just express malice. * * * The Court: It would be wholly immaterial what meaning the paper itself attached to the term. But it is material—assumed that the language used is libelous per se, and that there is a cause of action alleged—to show that, when they used this term, they did it deliberately, that they knew its meaning, and had used it in the newspaper in the sense in which it was meant to be used in this article."

At the close of plaintiff's case, there was further discussion as to these articles, and the court said:

"I consider the articles as evidence for any purpose that they may properly serve. I think they may properly serve the purpose of showing that the readers of the New York Herald, in which the alleged libelous article appeared, were educated to the meaning of that word in its invidious sense, because it had been appearing in these several articles—the most conspicuous articles in the paper—always where that term is used in this invidious sense. Why is it not proper not to enlarge the meaning, but to show under the allegation that the defendant intended to charge the improper relationship between the plaintiff here and this other woman, to show that the previous education of its readers by the Herald itself, it had taught its readers to attach that invidious meaning to that word? So that even if it were not in common use, if it did not have a commonly understood meaning, such as plaintiff claims for it, yet I do not see why that is not proper proof for the purpose of this suit, to show that the readers of the Herald had been taught by the Herald to attach that meaning to that word and used it in this article in that sense."

In the charge the court used the following language:

"The serious question that you will pass upon will be as to just what is the meaning of the language in the article in which the word 'affinity' appears. What construction, as it will appear to you when you read the article, would the ordinarily intelligent person in reading the article place upon it? What would he glean from it? And would that meaning hold the plaintiff up to ridicule, contempt, or hatred? If it would, then this plaintiff is entitled to damages, provided you find the charges made are untrue. * * * Of course this word 'affinity' is one newly introduced into our language. It is not more than a few years old at most in' the invidious sense in which it is now commonly used. You of course will have in mind, in passing upon just what was the meaning, what the ordinarily intelligent person would gather from the article, reading it in September, 1907, not 1909. As you have perhaps heard me say in the course of argument with counsel, if the word were used now, I should charge you that it had an invidious meaning; but then it was newly coined. In that connection you are at liberty to read the preceding issues of the New York Herald wherein the term is used, as throwing light upon what the clientele of the New York Herald would understand the term to mean as

used on the 21st of September, 1907. I think that I might take judicial notice of the fact that our great newspapers have, to a large extent, a steady clientele, that large numbers of people buy a certain paper all the time, day after day, week after week, month after month, and year after year. That, of course, is not true as to the entire body of readers of a newspaper, but at any rate it is true to a considerable extent. And one of the theories upon which I permitted these previous issues of the Herald to be introduced in evidence was that you might consider how far, by the use of the term 'affinity' in previous issues of the paper, it had educated its constant readers in its invidious use that in this day we understand."

The defendant excepted to that part of the charge in which the court stated that the word "affinity" now has an invidious sense as it is now commonly used, and that if it were used now it would have an invidious meaning.

It is apparent that these three prior articles figured very largely in the trial. The papers containing them, with their headlines conspicuously displayed, were constantly before the jury, the articles were read in extenso, they were the subject of much discussion between counsel and the court, numerous rulings were had thereon, and they were made the subject of a considerable portion of the charge. The articles themselves were of such a nature as could not fail seriously to affect the jury. They purported to show the moral uprising of a rural community against a person possessed of an "affinity," and the opinion of such community that such a person was deserving of being tarred and feathered, ridden on a rail, or even hanged. If, therefore, these articles were erroneously admitted in evidence, it is evident that this judgment cannot be sustained.

The word "affinity" is a common English word to be found in all English dictionaries, and in none of them to which our attention has been called is there ascribed the particular invidious meaning sought to be attached to the word upon this trial. Dictionary meanings, however, are not conclusive. English is not a dead but a virile language, flexible, progressive, continually being enriched from all sorts of sources; its common speech made piquant and interesting by slang and jargon, often better understood by the man in the street than the classic diction of its great masters. The noun "combine" meaning a secret combination for the purpose of committing fraud, a conspiracy, was added to the language by a witness on a famous trial in the city of New York in 1886, and is now a dictionary word. Of course there are innumerable instances of like character. If, as claimed by the plaintiff, and apparently conceded by the court, a new meaning had been attached to or coined for the word "affinity" shortly prior to the publication of the article complained of, that meaning should have been set forth in the complaint and a special issue tendered thereof.

The complaint sets forth an article, and of the whole article alleges the meaning the defendant intended to convey. If not libelous per se, a jury certainly was authorized to find that article libelous if false; but it was the whole article that was tendered as coming within the innuendo alleged, and there was no special picking out of the word "affinity" nor was any meaning attributed thereto. Perfectly innocent words, standing by themselves, may be thrown into such juxtaposition that together they become libelous. The rule in libel cases is that if

a word have two meanings, one bad and one good, the good shall be taken, unless by way of innuendo the bad meaning is brought to the attention of the court and relied upon. The vice in this record is the picking out of the word "affinity" and the attempt to ascribe to it upon the trial a meaning by evidence of prior articles which could only be admitted, if at all, under appropriate allegations.

If the plaintiff desired to extend the meaning of the word "affinity," he should have alleged as a fact the peculiar or slang meaning which he claimed the word had acquired, and then by colloquium alleged that the words complained of were published in connection with such meaning, and hence by innuendo that the article, as a whole, read in such light, charged unchastity.

"Where particular English words have acquired some sense different from their natural one, an averment by way of inducement of that acquired sense is necessary. An innuendo without such an averment would be insufficient. McGregor v. Gregory, 2 Dowl. (N. S.) 769. So held of the terms 'black sheep' and 'black leg.' Id. 'Baby farming.' Ramscar v. Gerry [1 N. Y. Supp. 635]." Townshend on Slander & Libel, § 133, note 1.

In Cassidy v. Brooklyn Eagle, 138 N. Y. 239, 33 N. E. 1038, the libel read:

"I have reason to think that this Cassidy is as big a rascal as Red Jim McDermott, and a bigger rascal."

Upon the trial the plaintiff was permitted to prove, under objection, certain articles published in the defendant's newspaper some years anterior to the article in question, in which the defendant animadverted in strong terms upon the character of McDermott. The court said:

"The original article complained of by plaintiff was without doubt libelous. * * * Plaintiff had made out his cause of action when he proved the publication of the article by defendant. The plaintiff desired to go farther and to prove what kind of a rascal McDermott was in the estimation of defendant. This was, as it seems to us, an enlargement of the libel itself, and in order to be admissible should have been averred in the complaint. * * * It was not admissible upon the question of malice or damages without being pleaded. * * * And unless pleaded, evidence amplifying and enlarging the libel itself would be in such case given, while no averment existed charging or setting forth the real libel upon which damages were sought to be recovered. * * * The prior publications contained no libel upon the plaintiff and did not refer to him directly or indirectly. To allow proof of them for the purpose of showing malice would be, as I have said, no more than enlarging by proof the character of the libel, while making no averment in regard to it. * * * It would be trying a matter of which the defendant had not complained, and in regard to which the defendant ought not to be called upon to defend. * * * He ought not to be allowed in effect to add to the natural and legal effect of the libel as it appears on its face, by this kind of proof, without setting up the facts which form a basis for such addition."

In Stuart v. New York Herald Company, 73 App. Div. 459, 77 N. Y. Supp. 216, the court said:

"But to enable plaintiff, in an action for libel, to give proof, the tendency of which is to enlarge the character of the libel, he must set up the facts in his complaint, although the articles published by the defendant, and upon which the action is framed, is libelous per se."

And for the admission of other articles published after the commencement of the suit the judgment was reversed.

In McNamara v. Goldan, 194 N. Y. 316, 87 N. E. 442, the court said:

"The letter does not charge the person therein referred to with the commission of any crime defined by statute or known to the common law, or of any act or conduct entitling the plaintiff to damages without proof of extrinsic facts. * * * It was, therefore, necessary for the plaintiff to include in his complaint allegations of extrinsic facts to show that the words used in the letter are actionable. * * * The office of the innuendo is to explain the meaning and application of the charge contained in the libel; but it cannot be used for the purpose of alleging new matter and extrinsic facts necessary in connection with the alleged libelous publication to constitute a cause of action."

It seems to us that the admission in evidence of the three prior articles was erroneous. Plaintiff had the right to go to the jury upon the whole article as printed, but upon this complaint did not have the right to submit evidence tending to show prior use by the defendant of the word "affinity" and the meaning by it ascribed thereto.

It follows, therefore, that the judgment and order appealed from should be reversed, and a new trial ordered, with costs to appellant to abide event. All concur.